Name: RUDY J. NANQUIL

Address: 1150 E Street, Unit 1801, San Diego, CA 92101

Phone: (619) 414-6686

Email: rudynanquil@gmail.com



**FILED**

Mar 04 2026

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY          s/ GloriaVocal          DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

RUDY J. NANQUIL,

         Plaintiff,

    v.

JP MORGAN CHASE BANK, N.A.;

SYNCHRONY BANK;

AMERICAN EXPRESS NATIONAL BANK;

BANK OF AMERICA, N.A.;

CALIFORNIA CREDIT UNION;

CITIBANK, N.A.;

WELLS FARGO BANK, N.A.;

TRANS UNION LLC;

EXPERIAN INFORMATION SOLUTIONS INC.;

and

EQUIFAX INFORMATION SERVICES LLC,

         Defendants.

Case No.: __'26CV1383 JLS  BJW__

**COMPLAINT FOR DAMAGES**

**FOR VIOLATIONS OF THE**

**FAIR CREDIT REPORTING ACT**

**15 USC § 1681, et seq.**

**JURY TRIAL DEMANDED**

1

**COMPLAINT**

## INTRODUCTION

1.     Plaintiff RUDY J. NANQUIL brings this action against Defendants, JPMORGAN CHASE BANK, N.A.; SYNCHRONY BANK; AMERICAN EXPRESS NATIONAL BANK; BANK OF AMERICA, N.A.; CALIFORNIA CREDIT UNION; CITIBANK, N.A.; WELLS FARGO BANK, N.A.; TRANS UNION LLC; EXPERIAN INFORMATION SOLUTIONS, INC.; and EQUIFAX INFORMATION SERVICES LLC for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq.

2.     This action arises from Defendants' failure to accurately report Plaintiff's consumer credit information and their failure to conduct reasonable investigations after receiving Plaintiff's written disputes.

3.     Despite detailed disputes identifying specific factual inaccuracies in Plaintiff's tradelines, Defendants continued to furnish and publish inaccurate and materially misleading information concerning Plaintiff.

4.     As a direct and proximate result, Plaintiff suffered credit denials, loss of housing opportunity, diminished creditworthiness, financial harm, and emotional distress.

5.     Plaintiff seeks actual damages, statutory damages, punitive damages, costs, and a trial by jury.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims

2

**COMPLAINT**

occurred in this District. Plaintiff resides in this District, submitted disputes from this District, and suffered the resulting injuries in this District.

8.    This Court has personal jurisdiction over Defendants because Defendants regularly conduct business in this District, purposefully avail themselves of the privileges of conducting activities within this District, and furnish, publish, or report consumer credit information concerning residents of this District, including Plaintiff. Defendants' conduct giving rise to the claims occurred in and was directed toward this District.

## PARTIES

9.    Plaintiff, Rudy J. Nanquil ("Plaintiff"), is a natural person and a resident of San Diego County, California. At all times relevant to this Complaint, Plaintiff was a "consumer" as defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681a(c).

10.    Defendant JPMorgan Chase Bank, N.A. is a national banking association organized under the laws of the United States, with its main office located at 1111 Polaris Parkway, Columbus, Ohio 43240. At all relevant times, Defendant JPMorgan Chase Bank, N.A. was a "furnisher of information" to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2. It may be served through its registered agent for service of process, CT Corporation System, 330 N Brand Blvd, Glendale, California 91203.

11.    Defendant Synchrony Bank is a federally chartered bank organized under the laws of the United States, with its principal office located at 170 Election Road, Suite 125, Draper, Utah 84020. At all relevant times, Defendant Synchrony Bank was a "furnisher of information" to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2. It may be served through its registered agent for service of process, CT Corporation System, 330 N Brand

3

COMPLAINT

Blvd, Glendale, California 91203.

12. Defendant American Express National Bank is a national banking association organized under the laws of the United States, with its main office located at 115 W. Towne Ridge Parkway, Sandy, Utah 84070. At all relevant times, Defendant American Express National Bank was a "furnisher of information" to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2. It may be served through its registered agent for service of process, CT Corporation System, 330 N. Brand Blvd., Glendale, California 91203.

13. Defendant Bank of America, N.A. is a national banking association organized under the laws of the United States, with its main office located at 100 North Tryon Street, Charlotte, North Carolina 28255. At all relevant times, Defendant Bank of America, N.A. was a "furnisher of information" to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2. It may be served through its registered agent for service of process, CT Corporation System, 330 N Brand Blvd, Glendale, California 91203.

14. Defendant California Credit Union is a state-chartered credit union organized under the laws of the State of California, with its principal place of business located at 701 N. Brand Blvd., Suite 700, Glendale, California 91203. At all relevant times, Defendant California Credit Union furnished information relating to consumer credit accounts to consumer reporting agencies and was a "furnisher of information" within the meaning of 15 U.S.C. § 1681s-2. It may be served through its agent for service of process, John D. Bretthauer, at 701 N. Brand Blvd., Suite 700, Glendale, California 91203.

15. Defendant Citibank, N.A. is a national banking association organized under the laws of the United States with its main office located in Sioux Falls, South Dakota. At all relevant times, Defendant Citibank, N.A. was a furnisher of information to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2. It may be served at 5800 S. Corporate Place, Mail Code 451, Sioux

4

**COMPLAINT**

Falls, South Dakota 57108.

16. Defendant Wells Fargo Bank, N.A. is a national banking association organized under the laws of the United States, with its main office located at 101 North Phillips Avenue, Sioux Falls, South Dakota 57104. At all relevant times, Defendant Wells Fargo Bank, N.A. was a "furnisher of information" to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2. It may be served through its registered agent for service of process in California, CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

17. Defendant Trans Union LLC is a limited liability company organized under the laws of Delaware, with its principal place of business located at 555 West Adams Street, Chicago, Illinois 60661. At all relevant times, Defendant Trans Union LLC was a consumer reporting agency as defined by 15 U.S.C. § 1681a(f), regularly assembling and evaluating consumer credit information for the purpose of furnishing consumer reports to third parties. It may be served through its registered agent for service of process, CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

18. Defendant Experian Information Solutions, Inc. is a corporation organized under the laws of Ohio, with its principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626. At all relevant times, Defendant Experian Information Solutions, Inc. was a consumer reporting agency as defined by 15 U.S.C. § 1681a(f), regularly assembling and evaluating consumer credit information for the purpose of furnishing consumer reports to third parties. It may be served through its registered agent for service of process in California, CT Corporation System, 330 N. Brand Blvd., Suite 700, Glendale, California 91203.

19. Defendant Equifax Information Services LLC is a limited liability

5

COMPLAINT

company organized under the laws of Georgia, with its principal place of business located at 1550 Peachtree Street NW, Atlanta, Georgia 30309. At all relevant times, Defendant Equifax Information Services LLC was a consumer reporting agency as defined by 15 U.S.C. § 1681a(f), regularly assembling and evaluating consumer credit information for the purpose of furnishing consumer reports to third parties. It may be served through its registered agent for service of process in California, The Prentice-Hall Corporation System, Inc., 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

## FACTUAL ALLEGATIONS

**A.**   **JPMorgan Chase Bank, N.A.**

   **1. Account Starting with 4147**

20.   Plaintiff maintains a consumer credit account with JPMorgan Chase Bank, N.A. ("Chase"), account starting with 4147, which Chase regularly furnishes to Experian, Equifax, and Trans Union.

21.   The 4147 tradeline contained inaccurate, incomplete, and internally inconsistent reporting, including the reporting of conflicting or unreliable information concerning the date opened, high credit amount, date last reported, date last active, and date of last payment.

22.   On or about September 14, 2025, Plaintiff mailed written disputes to Experian, Trans Union, and Equifax identifying these specific inaccuracies and providing supporting documentation.

23.   Although Plaintiff did not initially receive certified mail confirmation for all September 14 mailings, subsequent dispute results and written responses from the consumer reporting agencies confirm that the disputes were received and processed.

**COMPLAINT**

24. More than thirty (30) days after the consumer reporting agencies received Plaintiff's disputes, the inaccurate and materially misleading information remained in Plaintiff's consumer reports.

25. Upon information and belief, pursuant to 15 U.S.C. § 1681i(a)(2), the consumer reporting agencies transmitted Plaintiff's disputes and supporting documentation to Chase.

26. On October 1, 2025, Plaintiff mailed a detailed dispute letter to Chase via certified mail identifying the same inaccuracies and requesting supporting documentation, including payment history, original account agreements, and transaction records. The dispute was delivered and signed for on October 6, 2025.

27. On October 12 and 13, 2025, Chase issued written responses asserting that its reporting of the 4147 tradeline was accurate.

28. Chase's written responses merely restated the information it was currently reporting and asserted that the tradeline was accurate without providing any documentary evidence or account-level records substantiating the disputed data fields. Chase did not verify or explain the inaccurate and internally inconsistent reporting of the date opened, high credit amount, date last reported, or date of last payment, and disclaimed responsibility for certain reported data fields rather than addressing and resolving the discrepancies identified in Plaintiff's disputes.

29. Chase verified the disputed information as accurate despite the specific inaccuracies and discrepancies identified in Plaintiff's disputes and without correcting the disputed data fields.

30. Despite receiving notice of Plaintiff's disputes identifying specific inaccuracies in the reporting of the account, Chase verified the disputed information as accurate and continued furnishing the disputed reporting to consumer reporting agencies.

7

**COMPLAINT**

31.    On November 8, 2025, Plaintiff obtained a tri-merge credit report confirming that Chase continued to furnish materially inaccurate and internally inconsistent information across Experian, Equifax, and Trans Union.

32.    These inaccuracies and internal inconsistencies persisted after Chase received notice of dispute through the consumer reporting agencies and after Chase issued written verification responses.

33.    On November 9, 2025, Plaintiff mailed a second certified dispute letter to Chase, which was delivered on November 17, 2025.

34.    On November 25, 2025, Plaintiff submitted a formal complaint to the Consumer Financial Protection Bureau detailing Chase's continued furnishing of inaccurate information.

35.    On November 28, 2025, Chase responded through the CFPB portal reaffirming the accuracy of its reporting and declining to make corrections.

36.    In a subsequent CFPB response dated December 3, 2025, Chase acknowledged that an update was necessary for reporting to Trans Union, yet continued furnishing disputed information to consumer reporting agencies.

37.    On December 1, 2025, Plaintiff received an adverse action notice from Mission Federal Credit Union denying an auto loan based in part on credit information obtained from Experian that included the Chase tradeline.

38.    On December 18, 2025, Plaintiff mailed a certified Notice of Intent to Sue to Chase again challenging the continued reporting of inaccurate and materially misleading information concerning the 4147 tradeline and placing Chase on formal notice of its violations of the Fair Credit Reporting Act. USPS records confirm that the notice was delivered and signed for on December 26, 2025. Chase nevertheless continued furnishing the disputed information to consumer reporting agencies.

39.    On January 27, 2026, Plaintiff was denied a home loan after the lender obtained and relied upon Plaintiff's consumer credit report, which continued to

8

**COMPLAINT**

reflect the inaccurate Chase tradeline despite Plaintiff's prior disputes and Chase's repeated verification of the information as accurate.

40.     At the time of both adverse credit decisions, the disputed Chase tradeline remained materially inaccurate and unresolved. As a direct and proximate result of Chase's continued furnishing of inaccurate information after receiving multiple notices of dispute—including disputes transmitted by consumer reporting agencies, direct written disputes from Plaintiff, and a formal Notice of Intent to Sue—Plaintiff suffered denial of credit, financial harm, loss of credit opportunity, damage to credit reputation, stress, anxiety, and loss of sleep.

## B.     JPMorgan Chase Bank, N.A.
### 2.  Account Starting with 5213

41.     Plaintiff maintains a second consumer credit account with JPMorgan Chase Bank, N.A. ("Chase"), account starting with 5213, which Chase regularly furnishes to Experian, Equifax, and Trans Union.

42.     The 5213 tradeline contained inaccurate and materially misleading information. The inaccurate reporting included, among other things, the reporting of unreliable or conflicting information concerning the date opened, high credit amount, date last reported, date last active, and date of last payment.

43.     On or about September 14, 2025, Plaintiff mailed written disputes to Experian, Trans Union, and Equifax identifying the inaccuracies in the 5213 tradeline and providing supporting documentation.

44.     Although Plaintiff did not initially receive certified mail confirmation for all September 14 mailings, subsequent dispute results and written responses confirm that the disputes were received and processed.

45.     More than thirty (30) days after receipt of Plaintiff's disputes by the consumer reporting agencies, the inaccurate and materially misleading

9

**COMPLAINT**

information regarding the 5213 tradeline remained in Plaintiff's consumer reports.

46. Upon information and belief, pursuant to 15 U.S.C. § 1681i(a)(2), the consumer reporting agencies transmitted Plaintiff's disputes and supporting documentation concerning the 5213 tradeline to Chase.

47. On October 1, 2025, Plaintiff mailed a detailed dispute letter to Chase via certified mail identifying the same inaccuracies and specifically requesting supporting documentation, including payment history, original account agreements, and transaction records. The dispute was delivered and signed for on October 6, 2025.

48. On October 11 and 13, 2025, Chase issued written responses asserting that its reporting of the 5213 tradeline was accurate.

49. Chase's written responses merely restated the information it was reporting and asserted that the tradeline was accurate without providing documentary evidence or account-level records substantiating the disputed data fields. Chase failed to address the specific discrepancies identified in Plaintiff's disputes and disclaimed responsibility for certain reported data fields.

50. Upon information and belief, Chase verified the disputed information through automated procedures rather than conducting a substantive review of underlying account records.

51. On November 8, 2025, Plaintiff obtained a tri-merge credit report confirming that Chase continued to furnish materially inaccurate and internally inconsistent information across Experian, Equifax, and Trans Union.

52. These inaccuracies and internal inconsistencies persisted after Chase received notice of dispute through the consumer reporting agencies and after Chase issued written verification responses.

53. On November 9, 2025, Plaintiff mailed a second certified dispute letter to Chase, which was delivered on November 17, 2025.

10

**COMPLAINT**

54.    On November 25, 2025, Plaintiff submitted a formal complaint to the Consumer Financial Protection Bureau concerning Chase's continued furnishing of inaccurate information regarding the 5213 tradeline.

55.    On November 28, 2025, Chase responded through the CFPB portal reaffirming the accuracy of its reporting and declining to correct the identified discrepancies.

56.    On December 1, 2025, Plaintiff received an adverse action notice from Mission Federal Credit Union denying an auto loan based in part on credit information obtained from Experian that included the Chase tradeline.

57.    On December 18, 2025, Plaintiff mailed a certified Notice of Intent to Sue to Chase again challenging the continued reporting of inaccurate and materially misleading information concerning the 5213 tradeline and placing Chase on formal notice of its violations of the Fair Credit Reporting Act. USPS records confirm that the notice was delivered and signed for on December 26, 2025.

58.    On January 27, 2026, Plaintiff was denied a home loan after the lender obtained and relied upon Plaintiff's consumer credit report, which continued to reflect the inaccurate 5213 tradeline despite Plaintiff's prior disputes and Chase's repeated verification of the information as accurate.

59.    At the time of both adverse credit decisions, the disputed 5213 tradeline remained materially inaccurate and misleading. As a direct and proximate result of Chase's continued furnishing of inaccurate information after receiving multiple notices of dispute, including disputes transmitted by consumer reporting agencies and direct written disputes from Plaintiff, Plaintiff suffered economic harm, loss of housing opportunity, damage to credit reputation, stress, anxiety, and loss of sleep.

**C. Synchrony Bank**

11

60.    Plaintiff maintains a consumer credit account with Synchrony Bank ("Synchrony"), which Synchrony regularly furnishes to Experian, Equifax, and Trans Union.

61.    The Synchrony tradeline contained inaccurate and materially misleading information concerning the date opened, balance, high credit amount, date last reported, date last active, and date of last payment.

62.    On or about September 14, 2025, Plaintiff mailed written disputes concerning the Synchrony tradeline to Experian, Trans Union, and Equifax identifying these specific inaccuracies and providing supporting documentation.

63.    Although Plaintiff did not initially receive certified mail confirmation for all September 14 mailings, subsequent dispute results and written responses confirm that the disputes were received and processed.

64.    More than thirty (30) days after receipt of Plaintiff's disputes by the consumer reporting agencies, the inaccurate and materially misleading information regarding the Synchrony tradeline remained in Plaintiff's consumer reports.

65.    Upon information and belief, pursuant to 15 U.S.C. § 1681i(a)(2), the consumer reporting agencies transmitted Plaintiff's disputes and supporting documentation to Synchrony.

66.    On October 1, 2025, Plaintiff mailed a detailed dispute letter to Synchrony via certified mail identifying the same inaccuracies and specifically requesting supporting documentation, including payment history, original account agreements, and transaction records. USPS tracking confirms delivery on October 7, 2025.

67.    On October 10, 2025, Synchrony acknowledged receipt of Plaintiff's dispute via voicemail.

68.    On October 15, 2025, Synchrony issued a written response asserting that

12

**COMPLAINT**

Plaintiff's dispute allegedly lacked sufficient information to permit investigation and suggesting that the dispute may have been submitted by a credit repair organization.

69. Plaintiff's dispute included a copy of government-issued identification, proof of address, personal identifying information, and a copy of the relevant credit report highlighting the disputed tradeline.

70. Despite possessing sufficient information to identify the account and evaluate the disputed reporting fields, Synchrony declined to meaningfully investigate the dispute and failed to address the specific inaccuracies identified by Plaintiff.

71. After receiving notice of Plaintiff's disputes from the consumer reporting agencies pursuant to 15 U.S.C. §1681i(a)(2), Synchrony verified the disputed tradeline as accurate and continued furnishing the disputed information without correcting the inaccurate reporting.

72. On November 8, 2025, Plaintiff obtained a tri-merge credit report confirming that Synchrony continued to furnish materially inaccurate and internally inconsistent information across Experian, Equifax, and Trans Union.

73. In January and February 2026, updated consumer credit reports reflected continued inaccurate and inconsistent reporting of balances and high credit amounts.

74. These inaccuracies and internal inconsistencies persisted after Synchrony received notice of dispute through the consumer reporting agencies and after Plaintiff submitted direct disputes and a regulatory complaint.

75. On November 9, 2025, Plaintiff mailed a second certified dispute letter to Synchrony, delivered November 16, 2025.

76. On November 25, 2025, Plaintiff submitted a formal complaint to the Consumer Financial Protection Bureau concerning Synchrony's continued furnishing of inaccurate information.

13

**COMPLAINT**

77.    On December 5, 2025, Synchrony responded through the CFPB portal asserting that it had verified the account history as accurately reported and declined to delete or modify the tradeline.

78.    Synchrony's response did not explain the investigative steps undertaken, did not provide documentary substantiation of the disputed data fields, did not identify the individuals or records reviewed, and again requested documentation despite Plaintiff's prior submission of government-issued identification and supporting materials sufficient to investigate the dispute.

79.    On December 1, 2025, Plaintiff received an adverse action notice from Mission Federal Credit Union denying an auto loan based in part on credit information obtained from Experian that included the Synchrony tradeline.

80.    On December 18, 2025, Plaintiff mailed a certified Notice of Intent to Sue to Synchrony again challenging the continued reporting of inaccurate and materially misleading information concerning the Synchrony tradeline and placing Synchrony on formal notice of its violations of the Fair Credit Reporting Act. USPS records confirm that the notice was delivered and signed for on December 25, 2025.

81.    On January 27, 2026, Plaintiff was denied a home loan after the lender obtained and relied upon Plaintiff's consumer credit report, which continued to reflect the inaccurate and disputed Synchrony tradeline despite Plaintiff's prior disputes and Synchrony's verification of the information as accurate.

82.    At the time of both adverse credit decisions, the Synchrony tradeline remained materially inaccurate and misleading. As a direct and proximate result of Synchrony's failure to conduct a reasonable investigation and its continued furnishing of inaccurate information after receiving notice of dispute, Plaintiff suffered economic harm, loss of housing opportunity, damage to credit reputation, stress, anxiety, and loss of sleep.

14

**COMPLAINT**

## D. American Express National Bank

83.   Plaintiff maintains a consumer credit account with American Express National Bank ("AMEX"), which AMEX regularly furnishes to Experian, Equifax, and Trans Union.

84.   The AMEX tradeline contained inaccurate and materially misleading information concerning the date opened, balance, high credit amount, credit limit, date last reported, date last active, and date of last payment.

85.   On or about September 14, 2025, Plaintiff mailed written disputes concerning the AMEX tradeline to Experian, Trans Union, and Equifax identifying these specific inaccuracies and providing supporting documentation.

86.   On or about September 14, 2025, Plaintiff also mailed a detailed dispute letter via certified mail to AMEX identifying the same inaccuracies. USPS records confirm delivery on September 18, 2025.

87.   Upon information and belief, pursuant to 15 U.S.C. § 1681i(a)(2), the consumer reporting agencies transmitted Plaintiff's disputes and supporting documentation concerning the AMEX tradeline to American Express National Bank.

88.   On September 24, 2025, AMEX issued a written response enclosing certain billing statements and providing general account information, including the reported open date and balance. The response merely restated selected account data and did not address the specific reporting discrepancies identified by Plaintiff, did not meaningfully investigate the disputed data fields, and did not provide documentation or explanation describing the procedures undertaken to determine the accuracy and completeness of the reported information.

89.   Upon information and belief, after receiving notice of Plaintiff's disputes from the consumer reporting agencies, AMEX verified the disputed tradeline as accurate and continued furnishing the disputed information without correcting

15

**COMPLAINT**

the inaccurate reporting identified in Plaintiff's disputes.

90.     More than thirty (30) days after receipt of Plaintiff's disputes by the consumer reporting agencies, the inaccurate and materially misleading information remained in Plaintiff's consumer reports.

91.     On November 8, 2025, Plaintiff obtained a tri-merge credit report confirming that the AMEX tradeline reflected materially inaccurate and internally inconsistent information across Experian, Equifax, and Trans Union.

92.     On November 9, 2025, Plaintiff mailed a second certified dispute letter to AMEX reiterating the unresolved inaccuracies. USPS records confirm delivery on November 15, 2025.

93.     On November 20, 2025, AMEX issued an additional written response providing general account information and advising that the account would be reported as "in dispute." AMEX did not address the specific discrepancies identified in Plaintiff's disputes and did not demonstrate that it conducted a reasonable investigation of the disputed reporting fields before continuing to furnish the information as accurate.

94.     On November 25, 2025, Plaintiff submitted a formal complaint to the Consumer Financial Protection Bureau concerning AMEX's continued furnishing of inaccurate and materially misleading information.

95.     Despite receiving notice of dispute through the consumer reporting agencies, direct written disputes from Plaintiff, and a formal regulatory complaint, AMEX continued verifying and furnishing materially inaccurate and internally inconsistent information concerning the tradeline to Experian, Equifax, and Trans Union without conducting a reasonable investigation of the disputed balances, credit limits, high credit amounts, and activity dates identified in Plaintiff's disputes.

96.     In January and February 2026, updated consumer credit reports reflected continued inaccurate and inconsistent reporting of balances, high credit

16

**COMPLAINT**

amounts, credit limits, monthly payment amounts, and activity dates across the consumer reporting agencies.

97.    These inaccuracies and internal inconsistencies persisted after AMEX issued written verification responses and after being placed on regulatory notice.

98.    On December 1, 2025, Plaintiff received an adverse action notice from Mission Federal Credit Union denying an auto loan based in part on credit information obtained from Experian that included the AMEX tradeline.

99.    On December 18, 2025, Plaintiff mailed a certified Notice of Intent to Sue to American Express again challenging the continued reporting of inaccurate and materially misleading information concerning the AMEX tradeline and placing American Express on formal notice of its violations of the Fair Credit Reporting Act. USPS records confirm that the notice was delivered and signed for on December 26, 2025.

100.   On January 27, 2026, Plaintiff was denied a home loan after the lender obtained and relied upon Plaintiff's consumer credit report, which continued to reflect the inaccurate and disputed AMEX tradeline despite Plaintiff's prior disputes and AMEX's written verification of the information as accurate.

101.   At the time of both adverse credit decisions, the AMEX tradeline remained materially inaccurate and misleading. As a direct and proximate result of AMEX's failure to conduct a reasonable investigation and its continued furnishing of inaccurate information after receiving notice of dispute, Plaintiff suffered economic harm, loss of housing opportunity, damage to credit reputation, stress, anxiety, and loss of sleep.

**E. Bank of America, N.A.**

102.   Plaintiff maintains a consumer credit account with Bank of America,

17

**COMPLAINT**

N.A. ("BofA"), which BofA regularly furnishes to Experian, Equifax, and Trans Union.

103. The BofA tradeline contained inaccurate and materially misleading information concerning the date opened, high credit amount, balance, credit limit, date last reported, date last active, and date of last payment.

104. On or about September 14, 2025, Plaintiff mailed written disputes concerning the BofA tradeline to Experian, Trans Union, and Equifax identifying these specific inaccuracies and providing supporting documentation.

105. On or about September 14, 2025, Plaintiff also mailed a written dispute via certified mail to BofA identifying the same inaccuracies. USPS records confirm delivery on September 18, 2025.

106. Upon information and belief, pursuant to 15 U.S.C. § 1681i(a)(2), the consumer reporting agencies transmitted Plaintiff's disputes and supporting documentation concerning the BofA tradeline to Bank of America, N.A.

107. More than thirty (30) days after receipt of Plaintiff's disputes by the consumer reporting agencies, the inaccurate and materially misleading information remained in Plaintiff's consumer reports.

108. As of November 8, 2025, BofA had not provided any substantive written response addressing the specific discrepancies identified in Plaintiff's dispute, nor had it provided documentation substantiating the disputed data fields.

109. On November 28, 2025, BofA issued a written response stating that it had completed its research and that all reported account details were accurate. The response merely restated selected account information and did not describe the investigative steps undertaken, did not provide underlying account-level documentation, and did not address or resolve the specific discrepancies identified by Plaintiff in his disputes.

110. For example, the high credit amount, balance, credit limit, and activity dates differed among Experian, Equifax, and Trans Union, resulting in

18

**COMPLAINT**

materially inaccurate and misleading representations of the account.

111.  On November 9, 2025, Plaintiff mailed a second certified dispute letter reiterating the unresolved inaccuracies. USPS records confirm delivery on November 21, 2025.

112.  On November 25, 2025, Plaintiff submitted a formal complaint to the Consumer Financial Protection Bureau concerning BofA's continued furnishing of inaccurate and materially misleading information.

113.  On November 28, 2025, BofA issued a written response stating that it had completed its research and that all reported account details were accurate. The response reiterated certain account information but did not address the specific discrepancies identified by Plaintiff and did not demonstrate that a reasonable investigation had been conducted before continuing to furnish the disputed information as accurate.

114.  Despite receiving notice of dispute through the consumer reporting agencies, direct written disputes from Plaintiff, and a regulatory complaint, BofA continued verifying and furnishing materially inaccurate and internally inconsistent information concerning the tradeline and continued furnishing the disputed information without correcting the inaccurate reporting identified in Plaintiff's disputes.

115.  In January and February 2026, updated consumer credit reports reflected continued inaccurate and inconsistent reporting in reported balances, high credit amounts, credit limits, and activity dates across the consumer reporting agencies.

116.  These inaccuracies and internal inconsistencies persisted after BofA issued written verification responses and after Plaintiff provided repeated notice of dispute.

117.  On December 1, 2025, Plaintiff received an adverse action notice from Mission Federal Credit Union denying an auto loan based in part on credit

19

**COMPLAINT**

information obtained from Experian that included the BofA tradeline.

118.    On December 18, 2025, Plaintiff mailed a certified Notice of Intent to Sue to Bank of America again challenging the continued reporting of inaccurate and materially misleading information concerning the BofA tradeline and placing Bank of America on formal notice of its violations of the Fair Credit Reporting Act. USPS records confirm that the notice was delivered and signed for on December 26, 2025.

119.    On January 27, 2026, Plaintiff was denied a home loan after the lender obtained and relied upon Plaintiff's consumer credit report, which continued to reflect the inaccurate and disputed BofA tradeline despite Plaintiff's prior disputes and BofA's verification of the information as accurate.

120.    At the time of both adverse credit decisions, the BofA tradeline remained materially inaccurate and misleading. As a direct and proximate result of BofA's failure to conduct a reasonable investigation and its continued furnishing of inaccurate information after receiving notice of dispute, Plaintiff suffered economic harm, loss of housing opportunity, damage to credit reputation, stress, anxiety, and loss of sleep.

**F. California Credit Union**

121.    Plaintiff maintains a consumer credit account with California Credit Union ("CCU"), which CCU regularly furnishes to Experian, Equifax, and Trans Union.

122.    The CCU tradeline contained inaccurate and materially misleading information concerning the date opened, balance, date last reported, date last active, and date of last payment.

123.    On or about September 14, 2025, Plaintiff mailed written disputes concerning the CCU tradeline to Experian, Trans Union, and Equifax

20

**COMPLAINT**

identifying these specific inaccuracies and providing supporting documentation.

124. On September 14, 2025, Plaintiff also mailed a written dispute via certified mail to CCU identifying the same inaccuracies. USPS records confirm delivery on September 17, 2025.

125. Upon information and belief, pursuant to 15 U.S.C. § 1681i(a)(2), the consumer reporting agencies transmitted Plaintiff's disputes and supporting documentation concerning the CCU tradeline to California Credit Union.

126. On September 25, 2025, CCU issued a written response stating that it had reviewed and verified the information furnished to the consumer reporting agencies and that it was reporting the account correctly. The response merely restated selected account information and did not describe the investigative steps undertaken, did not provide underlying account-level documentation substantiating the disputed data fields, and did not address or resolve the specific discrepancies identified by Plaintiff in his dispute.

127. On November 8, 2025, Plaintiff obtained a tri-merge credit report confirming that the CCU tradeline reflected materially inaccurate and internally inconsistent information across Experian, Equifax, and Trans Union.

128. On November 9, 2025, Plaintiff mailed a second certified dispute letter reiterating the unresolved inaccuracies. USPS records confirm delivery on November 15, 2025.

129. On November 21, 2025, CCU issued a second written response stating that a "reporting update" had been submitted to the consumer reporting agencies and identifying certain updated account fields. The correspondence did not explain the nature or scope of any investigation conducted, did not identify what records were reviewed, and did not address or resolve the specific discrepancies previously identified by Plaintiff that continued to appear in his consumer reports.

130. On November 25, 2025, Plaintiff submitted a formal complaint to the

21

COMPLAINT

Consumer Financial Protection Bureau concerning CCU's continued furnishing of inaccurate and materially misleading information.

131. Despite receiving notice of dispute through the consumer reporting agencies, direct written disputes from Plaintiff, and a regulatory complaint, CCU continued verifying and furnishing materially inaccurate and internally inconsistent information concerning the tradeline and continued furnishing the disputed information without correcting the inaccurate reporting identified in Plaintiff's disputes.

132. In January and February 2026, updated consumer credit reports reflected continued inaccurate and inconsistent reporting in the reported date opened, balance, date last active, and date of last payment across the consumer reporting agencies.

133. These inaccuracies and internal inconsistencies persisted after CCU issued written verification responses and after Plaintiff provided repeated notice of dispute.

134. On December 1, 2025, Plaintiff received an adverse action notice from Mission Federal Credit Union denying an auto loan based in part on credit information obtained from Experian that included the CCU tradeline.

135. On December 18, 2025, Plaintiff mailed a certified Notice of Intent to Sue to California Credit Union again challenging the continued reporting of inaccurate and materially misleading information concerning the CCU tradeline and placing California Credit Union on formal notice of its violations of the Fair Credit Reporting Act. USPS records confirm that the notice was delivered and signed for on December 26, 2025.

136. On January 27, 2026, Plaintiff was denied a home loan after the lender obtained and relied upon Plaintiff's consumer credit report, which continued to reflect the inaccurate and disputed CCU tradeline despite Plaintiff's prior disputes and CCU's written verification of the information as accurate.

22

**COMPLAINT**

137.   At the time of both adverse credit decisions, the CCU tradeline remained materially inaccurate and misleading. As a direct and proximate result of CCU's failure to conduct a reasonable investigation and its continued furnishing of inaccurate information after receiving notice of dispute, Plaintiff suffered economic harm, loss of housing opportunity, damage to credit reputation, stress, anxiety, and loss of sleep.

**G. Citibank, N.A.**

138.   Plaintiff maintains a consumer credit account with Citibank, N.A. ("Citibank"), which Citibank regularly furnishes to Experian, Equifax, and Trans Union.

139.   The Citibank tradeline contained inaccurate and materially misleading information concerning the high credit amount, credit limit, balance, date last active, and date of last payment.

140.   On or about September 14, 2025, Plaintiff mailed written disputes concerning the Citibank tradeline to Experian, Trans Union, and Equifax identifying these specific inaccuracies and providing supporting documentation.

141.   On or about September 14, 2025, Plaintiff also mailed a written dispute to Citibank identifying the same inaccuracies. The dispute included Plaintiff's full name, address, government-issued identification, and a copy of the relevant portion of his credit report highlighting the disputed account information.

142.   Upon information and belief, the consumer reporting agencies transmitted Plaintiff's disputes and supporting documentation to Citibank.

143.   On September 23, 2025, Citibank issued a written response acknowledging receipt of Plaintiff's dispute but asserting that it lacked sufficient information to identify the specific account or investigate the disputed reporting fields, despite Plaintiff having provided his full name, address,

23

**COMPLAINT**

government-issued identification, and the account number associated with the tradeline.

144. On or about October 1, 2025, Plaintiff mailed a second certified dispute letter reiterating the same inaccuracies and again providing sufficient identifying information. USPS records confirm delivery on October 6, 2025.

145. On November 5, 2025, Citibank issued a second written response again asserting that it lacked sufficient information to investigate, and advising that the disputed information would remain on Plaintiff's credit reports unless additional documentation was provided, despite Plaintiff's prior submission of identifying documentation and the account number.

146. On November 8, 2025, Plaintiff obtained a tri-merge credit report confirming that the Citibank tradeline reflected materially inaccurate and internally inconsistent information across Experian, Equifax, and Trans Union.

147. On November 9, 2025, Plaintiff mailed a third certified dispute letter to Citibank again challenging the continued reporting of inaccurate and materially misleading information concerning the Citibank tradeline. USPS records confirm that the dispute was delivered and signed for on November 14, 2025.

148. On November 25, 2025, Plaintiff submitted a formal complaint to the Consumer Financial Protection Bureau concerning Citibank's continued furnishing of inaccurate and materially misleading information.

149. On December 18, 2025, Plaintiff mailed a certified Notice of Intent to Sue to Citibank again challenging the continued reporting of inaccurate and materially misleading information concerning the Citibank tradeline and placing Citibank on formal notice of its violations of the Fair Credit Reporting Act. USPS records confirm that the notice was delivered and signed for on December 25, 2025.

150. On December 16, 2025, Citibank issued a written response through the CFPB portal stating that it had reviewed Plaintiff's account and confirmed that

24

**COMPLAINT**

the information being furnished to the consumer reporting agencies was accurate. Citibank further indicated that it would request that the account be marked as disputed by the consumer.

151. Citibank's CFPB response did not address the specific discrepancies identified by Plaintiff, did not explain the investigative steps undertaken, and did not demonstrate that a reasonable investigation had been conducted before verifying the disputed information as accurate.

152. Despite receiving repeated notice of dispute through the consumer reporting agencies, direct written disputes, and a regulatory complaint, Citibank continued furnishing materially inaccurate and internally inconsistent information concerning the tradeline in January and February 2026.

153. Updated consumer credit reports obtained in January and February 2026 reflected continued inaccuracies and internal inconsistencies in the reported high credit amount, credit limit, balance, and activity dates across the consumer reporting agencies.

154. These inaccuracies and internal inconsistencies persisted after Citibank issued written responses asserting that it had verified the account as accurately reported.

155. On December 1, 2025, Plaintiff received an adverse action notice from Mission Federal Credit Union denying an auto loan based in part on credit information obtained from Experian that included the Citibank tradeline.

156. On January 27, 2026, Plaintiff was denied a home loan based in part on inaccurate credit information, including the Citibank tradeline.

157. As a direct and proximate result of Citibank's continued furnishing of inaccurate information after receiving notice of dispute, Plaintiff suffered economic harm, loss of housing opportunity, damage to credit reputation, stress, anxiety, and loss of sleep.

**COMPLAINT**

**H. Wells Fargo Bank, N.A.**

158.   Plaintiff maintains a consumer credit account with Wells Fargo Bank, N.A. ("Wells Fargo"), which Wells Fargo regularly furnishes to Experian, Equifax, and Trans Union.

159.   The Wells Fargo tradeline contained inaccurate and materially misleading information concerning the date opened, high credit amount, credit limit, date last reported, date last active, and date of last payment.

160.   On or about September 14, 2025, Plaintiff mailed written disputes concerning the Wells Fargo tradeline to Experian, Trans Union, and Equifax identifying these specific inaccuracies and providing supporting documentation.

161.   On or about September 14, 2025, Plaintiff also mailed a written dispute via certified mail to Wells Fargo identifying the same inaccuracies. USPS records confirm delivery on September 19, 2025.

162.   Upon information and belief, the consumer reporting agencies transmitted Plaintiff's disputes and supporting documentation to Wells Fargo.

163.   On September 29, 2025, Wells Fargo issued a written response stating that it had carefully researched Plaintiff's account history and determined that the information furnished to the consumer reporting agencies was accurate.

164.   Wells Fargo's response did not address the specific reporting discrepancies identified by Plaintiff, did not demonstrate that a reasonable investigation had been conducted before verifying the disputed information as accurate, and did not provide documentary substantiation supporting its verification.

165.   On November 8, 2025, Plaintiff obtained a tri-merge credit report confirming that the Wells Fargo tradeline reflected materially inaccurate and internally inconsistent information across Experian, Equifax, and Trans Union.

166.   For example, Wells Fargo reported a $0.00 credit limit to Equifax while

26

simultaneously reporting a $21,500 credit limit to other consumer reporting agencies. The high credit amount, date opened, and activity dates also differed among Experian, Equifax, and Trans Union.

167.   On November 9, 2025, Plaintiff mailed a second certified dispute letter reiterating the unresolved inaccuracies. USPS records confirm delivery on November 17, 2025.

168.   On November 25, 2025, Plaintiff submitted a formal complaint to the Consumer Financial Protection Bureau concerning Wells Fargo's continued furnishing of inaccurate and materially misleading information.

169.   On December 1, 2025, Plaintiff received an adverse action notice from Mission Federal Credit Union denying an auto loan based in part on credit information obtained from Experian that included the Wells Fargo tradeline.

170.   On December 1, 2025, Wells Fargo issued an additional written response again stating that it had carefully researched the account and confirmed the accuracy of the reporting.

171.   On December 5, 2025, Wells Fargo issued a further response through the CFPB portal reiterating that it had completed its research and confirmed the reported open date, high credit amount, last reported date, last payment date, and account status.

172.   On December 18, 2025, Plaintiff mailed a certified Notice of Intent to Sue to Wells Fargo Bank, N.A., again challenging the continued reporting of inaccurate and materially misleading information concerning the Wells Fargo tradeline and placing Wells Fargo on formal notice of its violations of the Fair Credit Reporting Act. USPS records confirm that the notice was delivered and signed for on December 30, 2025.

173.   Wells Fargo did not address the specific inaccuracies identified by Plaintiff and repeatedly verified the tradeline as accurate without correcting the disputed reporting fields.

27

**COMPLAINT**

174.   On January 27, 2026, Plaintiff was denied a home loan based in part on inaccurate credit information, including the Wells Fargo tradeline.

175.   Despite receiving repeated notice of dispute through the consumer reporting agencies, direct written disputes, and a regulatory complaint, Wells Fargo continued furnishing materially inaccurate and internally inconsistent information concerning the tradeline in January and February 2026.

176.   As a direct and proximate result of Wells Fargo's continued furnishing of inaccurate information after receiving notice of dispute, Plaintiff suffered economic harm, loss of housing opportunity, damage to credit reputation, stress, anxiety, and loss of sleep.

**I. Trans Union LLC**

177.   Trans Union LLC ("TransUnion") regularly assembles, maintains, and furnishes consumer credit information to third parties, including information concerning Plaintiff.

178.   On or about September 14, 2025, Plaintiff mailed a detailed written dispute to TransUnion identifying materially inaccurate and internally inconsistent information appearing in his credit file, including inaccuracies relating to personal identifying information, multiple account tradelines, and unauthorized inquiries.

179.   The dispute was delivered and signed for on September 18, 2025.

180.   Upon information and belief, TransUnion received Plaintiff's dispute and supporting documentation and was required to conduct a reasonable reinvestigation of the disputed information pursuant to 15 U.S.C. §1681i(a).

181.   On November 8, 2025, Plaintiff obtained a consumer report confirming that materially inaccurate and internally inconsistent information remained in his TransUnion credit file, including conflicting balances, high credit amounts,

28

**COMPLAINT**

credit limits, dates opened, dates last reported, dates last active, and dates of last payment concerning multiple disputed tradelines.

182.   On November 9, 2025, Plaintiff mailed a second written dispute renewing his request for reinvestigation. The dispute was delivered and signed for on November 13, 2025.

183.   TransUnion acknowledged receipt of the dispute and stated that it was awaiting responses from furnishers.

184.   On November 25, 2025, Plaintiff submitted a formal complaint to the Consumer Financial Protection Bureau concerning TransUnion's handling of his disputes.

185.   On December 6, 2025, TransUnion issued written "Investigation Results" stating that it had investigated the disputed items and updated certain account fields based on information received from furnishers.

186.   The December 6 response did not provide copies of the information received from furnishers, did not meaningfully describe the procedures used in conducting the reinvestigation, and did not explain how TransUnion evaluated the specific inaccuracies identified in Plaintiff's dispute. TransUnion continued publishing the disputed information without correcting or deleting inaccurate or incomplete data fields.

187.   On January 3, 2026, TransUnion submitted a response through the CFPB portal stating that it had completed its reinvestigation and listing certain actions taken, including removal of certain personal information and marking multiple tradelines as verified or in dispute status. The CFPB response did not explain how TransUnion conducted its reinvestigation of the disputed reporting fields and did not describe the procedures used to determine the accuracy and completeness of the information before continuing to report it.

188.   On January 8, 2026, Plaintiff mailed a formal Notice of Intent to Sue reiterating TransUnion's failure to correct inaccurate and materially

**COMPLAINT**

inconsistent information and requesting deletion of the disputed tradelines.

189.   On January 13, 2026, TransUnion issued additional reinvestigation results stating that multiple disputed tradelines had been verified as accurate, while certain fields were updated based on furnisher responses.

190.   USPS records confirm that the Notice of Intent to Sue was delivered and signed for on January 14, 2026.

191.   Despite multiple disputes, regulatory complaints, and Plaintiff's Notice of Intent to Sue, TransUnion continued publishing inaccurate and internally inconsistent information in January and February 2026.

192.   Updated consumer reports obtained in January and February 2026 continued to reflect unresolved inaccuracies and internal inconsistencies, including conflicting balances, credit limits, high credit amounts, and activity dates that materially affected Plaintiff's reported utilization and account age metrics.

193.   On January 27, 2026, Plaintiff was denied a home loan after the lender obtained and relied upon Plaintiff's consumer credit report and credit score, which included information reported and published by TransUnion that remained inaccurate and unresolved at the time of the denial.

194.   As a direct and proximate result of TransUnion's continued publication of inaccurate information after receiving notice of dispute, Plaintiff suffered economic harm, loss of housing opportunity, damage to credit reputation, stress, anxiety, and loss of sleep.

## J. Experian Information Solutions, Inc.

195.   Experian Information Solutions, Inc. ("Experian") regularly assembles, maintains, and furnishes consumer credit information to third parties, including information concerning Plaintiff.

30

COMPLAINT

196.   On or about September 14, 2025, Plaintiff mailed a detailed written dispute to Experian identifying materially inaccurate and internally inconsistent information appearing in his credit file, including inaccurate personal identifying information, multiple account tradelines, and unauthorized inquiries.

197.   The dispute was delivered and signed for on September 18, 2025.

198.   On September 23, 2025, Experian issued a written response stating that it had received a request regarding Plaintiff's credit information that did not appear to have been sent directly by Plaintiff or authorized by him, and that it had not taken action on the request.

199.   Despite receiving a written dispute submitted directly by Plaintiff and supported by sufficient identifying documentation, Experian refused to conduct any reinvestigation and did not evaluate the specific inaccuracies identified in Plaintiff's dispute as required under 15 U.S.C. § 1681i(a).

200.   On November 9, 2025, Plaintiff mailed a second written dispute reiterating the unresolved inaccuracies and again providing identifying information. The dispute was delivered and signed for on November 15, 2025.

201.   On November 19, 2025, Experian issued correspondence describing its general dispute procedures and requesting identifying information. The correspondence did not identify specific disputed tradelines and did not provide the results of any reinvestigation.

202.   On November 25, 2025, Plaintiff filed a formal complaint with the Consumer Financial Protection Bureau concerning Experian's handling of his disputes.

203.   On December 1, 2025, Plaintiff received an adverse action notice from Mission Federal Credit Union stating that its decision was based in whole or in part on information obtained from Experian.

204.   On December 5, 2025, Experian issued additional correspondence describing its dispute procedures but did not provide specific reinvestigation

31

**COMPLAINT**

results addressing Plaintiff's disputed tradelines.

205.   On December 17, 2025, Experian issued written reinvestigation results stating that its investigation was complete and listing outcomes for multiple disputed tradelines, including items marked as "Updated," "Processed," and "Remains," with certain accounts certified by furnishers as accurate.

206.   The December 17 reinvestigation results did not explain how Experian evaluated the specific inaccuracies identified in Plaintiff's disputes and did not meaningfully describe the procedures used in conducting the reinvestigation. The results also failed to address the inaccurate and internally inconsistent reporting fields reflected in Plaintiff's Experian credit file.

207.   On January 8, 2026, Plaintiff mailed a formal Notice of Intent to Sue reiterating the ongoing inaccurate and materially inconsistent reporting and requesting deletion or correction of the disputed tradelines. USPS records confirm delivery on January 12, 2026.

208.   On January 16, 2026, Experian issued additional correspondence again stating that it had not taken action on Plaintiff's request because it could not verify that the request originated from Plaintiff, despite having previously processed Plaintiff's disputes and issued reinvestigation results concerning the same credit file.

209.   Despite multiple disputes, regulatory complaints, written reinvestigation results, and Plaintiff's Notice of Intent to Sue, Experian continued reporting materially inaccurate and internally inconsistent information, including conflicting balances, credit limits, high credit amounts, dates opened, and activity dates affecting Plaintiff's reported utilization and account age metrics.

210.   On January 27, 2026, Plaintiff was denied a home loan after the lender obtained and relied upon Plaintiff's consumer credit report and credit score, which included information appearing in Plaintiff's Experian credit file that remained inaccurate and unresolved at the time of the denial.

32

**COMPLAINT**

211.   As a direct and proximate result of Experian's continued publication of inaccurate information after receiving notice of dispute, Plaintiff suffered economic harm, loss of housing opportunity, damage to credit reputation, stress, anxiety, and loss of sleep.

## K. Equifax Information Services LLC

212.   Equifax Information Services LLC ("Equifax") regularly assembles, maintains, and furnishes consumer credit information to third parties, including information concerning Plaintiff.

213.   On or about September 15, 2025, Plaintiff mailed an initial written dispute to Equifax identifying inaccurate and internally inconsistent information.

214.   After continuing to observe the same inaccuracies, Plaintiff re-submitted a detailed written dispute on October 1, 2025 identifying inaccuracies relating to personal identifiers, multiple account tradelines, and unauthorized inquiries.

215.   The October 1 dispute was delivered and signed for on October 5, 2025.

216.   On October 7, 2025, Equifax issued written reinvestigation results stating that certain disputed items had been deleted, updated, or verified as accurate.

217.   The October 7 response did not meaningfully describe the procedures used in conducting the reinvestigation, did not explain how the specific inaccuracies identified by Plaintiff were evaluated, and did not address the materially inaccurate and internally inconsistent reporting fields reflected in Plaintiff's Equifax credit file.

218.   On November 9, 2025, Plaintiff mailed a second written dispute renewing his request for reinvestigation. The dispute was delivered and signed for on November 16, 2025.

219.   On November 22, 2025, Equifax issued a written response stating that a

33

**COMPLAINT**

prior dispute concerning the same tradelines was already in process and that it would not research the newly submitted dispute, characterizing it as frivolous.

220.  Equifax refused to investigate the renewed dispute and did not explain why the dispute lacked sufficient information or was properly deemed frivolous under 15 U.S.C. §1681i(a)(3), despite Plaintiff identifying specific ongoing inaccuracies and providing supporting documentation.

221.  On November 25, 2025, Plaintiff filed a complaint with the Consumer Financial Protection Bureau regarding Equifax's handling of the disputes.

222.  On December 5, 2025, Equifax issued additional reinvestigation results stating that multiple disputed tradelines were verified as accurate by furnishers. Despite this verification, materially inaccurate and internally inconsistent reporting remained in Plaintiff's Equifax credit file, including conflicting balances, credit limits, high credit amounts, dates opened, and activity dates.

223.  On December 18, 2025, Plaintiff mailed a Notice of Intent to Sue to Equifax. USPS records confirm delivery on December 25, 2025.

224.  On January 9, 2026, Equifax issued additional reinvestigation results again listing the previously disputed tradelines and reflecting that certain items had been updated or maintained as reported.

225.  The January 9 reinvestigation results did not meaningfully describe the procedures used in conducting the reinvestigation and did not explain how Equifax evaluated the specific inaccuracies identified in Plaintiff's disputes before continuing to report the information.

226.  On January 17, 2026, Equifax submitted a response through the CFPB portal stating that it had completed its reinvestigation and describing its general dispute procedures.

227.  Despite multiple disputes, reinvestigation results, regulatory complaints, and Plaintiff's Notice of Intent to Sue, Equifax continued publishing materially inaccurate and internally inconsistent information in January and February

34

**COMPLAINT**

2026.

228.    Updated consumer credit reports obtained in January and February 2026 continued to reflect unresolved inaccuracies within Plaintiff's Equifax credit file, including conflicting balances, credit limits, high credit amounts, dates opened, and activity dates affecting Plaintiff's reported utilization and account age metrics.

229.    On January 27, 2026, Plaintiff was denied a home loan after the lender obtained and relied upon Plaintiff's consumer credit report and credit score, which included information appearing in Plaintiff's Equifax credit file that remained inaccurate and unresolved at the time of the denial.

230.    As a direct and proximate result of Equifax's continued publication of inaccurate information after receiving notice of dispute, Plaintiff suffered economic harm, loss of housing opportunity, damage to credit reputation, stress, anxiety, and loss of sleep.

## COUNT I
### JPMorgan Chase Bank, N.A.
### Violation of 15 U.S.C. § 1681s-2(b)

231.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

232.    Defendant JPMorgan Chase Bank, N.A. ("Chase") is a furnisher of information to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2.

233.    Plaintiff submitted formal written disputes to Experian, Equifax, and TransUnion identifying inaccurate and internally inconsistent information concerning two Chase accounts starting with 4147 and 5213, including reporting relating to the date opened, high credit amount, date last reported, date

35

**COMPLAINT**

last active, and date of last payment.

234. Upon information and belief, pursuant to 15 U.S.C. § 1681i(a)(2), the consumer reporting agencies transmitted notice of Plaintiff's disputes and all relevant information provided by Plaintiff to Chase.

235. After receiving notice of the disputes, Chase was required under 15 U.S.C. § 1681s-2(b) to:

    a. Conduct a reasonable investigation with respect to the disputed information;

    b. Review all relevant information provided by the consumer reporting agencies;

    c. Report the results of the investigation to the consumer reporting agencies; and

    d. If the information was found to be inaccurate, incomplete, or could not be verified after investigation, modify, delete, or permanently cease reporting such information and report those results to all consumer reporting agencies to which the information was furnished.

236. After receiving notice of the disputes from the consumer reporting agencies, Chase continued furnishing the disputed information and represented to the consumer reporting agencies that the information was accurate.

237. Updated consumer reports obtained after Chase's verification responses confirmed that the disputed inaccuracies remained unresolved and continued to appear in Plaintiff's consumer credit files.

238. In responding to Plaintiff's CFPB complaint, Chase acknowledged that reporting updates were necessary with respect to at least one consumer reporting agency, further demonstrating that information previously verified as accurate required correction.

239. Upon information and belief, Chase failed to conduct a reasonable investigation sufficient to resolve the specific discrepancies identified in

36

**COMPLAINT**

Plaintiff's disputes, including inaccuracies relating to the date opened, high credit amount, activity dates, and payment history.

240.  Chase's conduct constitutes a violation of 15 U.S.C. § 1681s-2(b).

241.  Chase's violations were willful in that, after receiving repeated notice of Plaintiff's disputes from multiple consumer reporting agencies, Chase continued furnishing inaccurate and internally inconsistent information and failed to conduct a reasonable investigation in reckless disregard of its statutory duties under the Fair Credit Reporting Act.

242.  In the alternative, Chase's conduct was negligent in that it failed to exercise reasonable care in investigating and correcting the disputed reporting.

243.  As a direct and proximate result of Chase's violations, Plaintiff suffered actual damages, including denial of credit, loss of housing opportunity, diminished creditworthiness, damage to credit reputation, emotional distress, and time and expense incurred attempting to correct inaccurate reporting.

244.  Pursuant to 15 U.S.C. § 1681n(a), Plaintiff is entitled to statutory damages, punitive damages, costs, and reasonable attorneys' fees for Chase's willful violations.

245.  Pursuant to 15 U.S.C. § 1681o(a), Plaintiff is entitled to recover actual damages, costs, and reasonable attorneys' fees for Chase's negligent violations.

## COUNT II

### Synchrony Bank

### Violation of 15 U.S.C. § 1681s-2(b)

246.  Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

247.  Defendant Synchrony Bank ("Synchrony") is a furnisher of information to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2.

37

**COMPLAINT**

248.   Plaintiff maintains a consumer credit account with Synchrony that Synchrony furnished and continues to furnish to Experian Information Solutions, Inc., Trans Union LLC, and Equifax Information Services LLC.

249.   Plaintiff submitted written disputes to Experian, Trans Union, and Equifax identifying materially inaccurate and internally inconsistent information concerning the Synchrony tradeline, including but not limited to the date opened, balance, high credit amount, credit limit, date last reported, date last active, and date of last payment.

250.   Pursuant to 15 U.S.C. §1681i(a)(2), the consumer reporting agencies transmitted notice of Plaintiff's disputes and relevant information provided by Plaintiff to Synchrony, thereby triggering Synchrony's statutory duties under 15 U.S.C. §1681s-2(b).

251.   Upon receiving notice of the disputes from the consumer reporting agencies, Synchrony was required under 15 U.S.C. § 1681s-2(b) to conduct a reasonable investigation, review all relevant information provided by the consumer reporting agencies, report the results of the investigation to the consumer reporting agencies, and, if the information was found to be inaccurate, incomplete, or unverifiable, modify, delete, or cease reporting such information.

252.   After receiving notice of the disputes from the consumer reporting agencies, Synchrony continued furnishing the disputed information and represented to the consumer reporting agencies that the information was accurate without resolving the specific discrepancies identified in Plaintiff's disputes.

253.   On or about October 1, 2025, Plaintiff also mailed a detailed written dispute directly to Synchrony via certified mail specifically identifying inaccuracies in the reporting of the account. The dispute was delivered on October 7, 2025, confirming receipt.

38

**COMPLAINT**

254. On or about October 15, 2025, Synchrony issued a written response asserting that the tradeline was accurate and requesting additional documentation, despite Plaintiff having already provided sufficient identifying information to locate the account and investigate the dispute. Synchrony did not provide documentary verification of the disputed reporting and did not describe the investigative steps undertaken.

255. Plaintiff submitted a second written dispute on November 9, 2025, which was delivered on November 16, 2025. Despite repeated notice, Synchrony continued to verify the tradeline as accurate.

256. On November 25, 2025, Plaintiff filed a formal complaint with the Consumer Financial Protection Bureau placing Synchrony on further notice of the continued inaccurate and materially inconsistent reporting. Synchrony nevertheless maintained that the reporting was accurate and declined to correct the identified discrepancies.

257. Updated consumer reports obtained after expiration of the statutory reinvestigation period confirmed that the disputed data fields remained inaccurate and internally inconsistent within Plaintiff's consumer credit files and continued to be verified as accurate by Synchrony despite the presence of conflicting reporting.

258. The conflicting reporting of the account's balance, high credit amount, credit limit, and activity dates created an inaccurate and misleading depiction of the account within Plaintiff's consumer credit files.

259. Subsequent credit reports obtained in January and February 2026 reflected additional conflicting balances, credit limits, high credit amounts, and activity dates in the Synchrony tradeline even after Synchrony had verified the account as accurate, further demonstrating that Synchrony failed to conduct a reasonable investigation sufficient to resolve the specific inaccuracies identified in Plaintiff's disputes.

39

**COMPLAINT**

260.  Upon information and belief, Synchrony failed to conduct a reasonable investigation sufficient to review underlying account-level information and resolve the specific discrepancies identified in Plaintiff's disputes.

261.  Synchrony's repeated verification of inaccurate and internally inconsistent information after receiving notice of dispute from multiple consumer reporting agencies, direct written disputes from Plaintiff, and regulatory notice through the Consumer Financial Protection Bureau demonstrates reckless disregard for its statutory obligations under 15 U.S.C. §1681s-2(b).

262.  In the alternative, Synchrony's failure to conduct a reasonable investigation and correct inaccurate reporting constitutes negligent noncompliance with the Fair Credit Reporting Act.

263.  As a direct and proximate result of Synchrony's violations of 15 U.S.C. § 1681s-2(b), Plaintiff suffered actual damages, including denial of credit, denial of an auto loan on December 1, 2025, denial of a home loan on January 27, 2026, loss of housing opportunity, diminished creditworthiness, damage to credit reputation, economic harm, and emotional distress including stress, anxiety, frustration, loss of sleep, and humiliation.

264.  Pursuant to 15 U.S.C. § 1681n(a), Plaintiff is entitled to statutory damages, punitive damages, and reasonable attorneys' fees and costs for Synchrony's willful violations.

265.  Pursuant to 15 U.S.C. § 1681o(a), Plaintiff is entitled to recover actual damages, together with costs and reasonable attorneys' fees, for Synchrony's negligent violations.

## COUNT III
### American Express National Bank
### Violation of 15 U.S.C. § 1681s-2(b)

40

COMPLAINT

266.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

267.    Defendant American Express National Bank ("American Express") is a furnisher of information to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2.

268.    Plaintiff maintains a consumer credit account with American Express that American Express furnished and continues to furnish to Experian Information Solutions, Inc., Trans Union LLC, and Equifax Information Services LLC.

269.    Plaintiff submitted written disputes to Experian, Trans Union, and Equifax identifying materially inaccurate and internally inconsistent information concerning the American Express tradeline, including but not limited to the date opened, high credit amount, credit limit, reported balance, monthly payment, date last reported, date last active, and date of last payment.

270.    Pursuant to 15 U.S.C. §1681i(a)(2), the consumer reporting agencies transmitted notice of Plaintiff's disputes and the relevant information provided by Plaintiff to American Express, thereby triggering American Express's statutory duties under 15 U.S.C. §1681s-2(b).

271.    Upon receiving notice of the disputes from the consumer reporting agencies, American Express was required under 15 U.S.C. § 1681s-2(b) to conduct a reasonable investigation, review all relevant information provided by the consumer reporting agencies, report the results of the investigation to the consumer reporting agencies, and, if the information was found to be inaccurate, incomplete, or unverifiable, modify, delete, or cease reporting such information.

272.    After receiving notice of Plaintiff's disputes from the consumer reporting agencies, American Express continued furnishing the disputed information and represented to the consumer reporting agencies that the information was

41

**COMPLAINT**

accurate without resolving the specific discrepancies identified in Plaintiff's disputes.

273.   On or about September 14, 2025, Plaintiff mailed a detailed written dispute directly to American Express via certified mail specifically identifying inaccuracies in the reporting of the account. The dispute was delivered on September 18, 2025.

274.   On or about September 24, 2025, American Express issued written responses enclosing selected account statements and listing certain account data but did not address the specific discrepancies identified in Plaintiff's dispute and did not describe the investigative steps undertaken to verify the disputed reporting.

275.   Plaintiff submitted a second written dispute on November 9, 2025, which was delivered on November 15, 2025. On or about November 20, 2025, American Express again asserted that the account was accurate and reported as "in dispute," but failed to address the specific discrepancies identified by Plaintiff and failed to demonstrate that a reasonable investigation had been conducted before continuing to furnish the disputed information as accurate.

276.   On November 25, 2025, Plaintiff filed a complaint with the Consumer Financial Protection Bureau placing American Express on further regulatory notice of the continued inaccurate and materially inconsistent reporting.

277.   On December 1, 2025, Plaintiff received an adverse action notice denying an auto loan. The credit report relied upon in connection with the denial contained the American Express tradeline and the disputed inaccuracies described above, resulting in economic harm.

278.   Updated consumer reports obtained after expiration of the statutory reinvestigation period confirmed that the disputed data fields remained inaccurate and internally inconsistent within Plaintiff's consumer credit files and continued to be verified as accurate by American Express despite the

**COMPLAINT**

presence of materially conflicting reporting.

279. The conflicting reporting of the account's high credit amount, credit limit, balance, monthly payment, and activity dates created an inaccurate and misleading depiction of the account within Plaintiff's consumer credit files.

280. Subsequent credit reports obtained in January and February 2026 reflected continued conflicting balances, credit limits, high credit amounts, payment amounts, and activity dates in the American Express tradeline even after American Express had verified the account as accurate, further demonstrating that American Express failed to conduct a reasonable investigation sufficient to resolve the specific inaccuracies identified in Plaintiff's disputes.

281. Upon information and belief, American Express failed to conduct a reasonable investigation sufficient to review underlying account-level information and resolve the specific discrepancies identified in Plaintiff's disputes.

282. American Express's repeated verification of materially inaccurate and internally inconsistent information after receiving notice of dispute from multiple consumer reporting agencies, after direct written disputes from Plaintiff, and after regulatory notice through the Consumer Financial Protection Bureau complaint, demonstrates reckless disregard for its statutory obligations under 15 U.S.C. § 1681s-2(b).

283. In the alternative, American Express's failure to conduct a reasonable investigation and correct inaccurate reporting constitutes negligent noncompliance with the Fair Credit Reporting Act.

284. As a direct and proximate result of American Express's violations of 15 U.S.C. § 1681s-2(b), Plaintiff suffered actual damages, including denial of credit, denial of an auto loan on December 1, 2025, denial of a home loan on January 27, 2026, loss of housing opportunity, diminished creditworthiness,

43

**COMPLAINT**

damage to credit reputation, economic harm, and emotional distress including stress, anxiety, frustration, loss of sleep, and humiliation.

285.   Pursuant to 15 U.S.C. § 1681n(a), Plaintiff is entitled to statutory damages, punitive damages, and reasonable attorneys' fees and costs for American Express's willful violations.

286.   Pursuant to 15 U.S.C. § 1681o(a), Plaintiff is entitled to recover actual damages, together with costs and reasonable attorneys' fees, for American Express's negligent violations.

## COUNT IV
## Bank of America, N.A.
## Violation of 15 U.S.C. § 1681s-2(b)

287.   Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

288.   Defendant Bank of America, N.A. ("Bank of America") is a furnisher of information to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2.

289.   Plaintiff maintains a consumer credit account with Bank of America that Bank of America furnished and continues to furnish to Experian Information Solutions, Inc., Trans Union LLC, and Equifax Information Services LLC.

290.   Plaintiff submitted written disputes to Experian, Trans Union, and Equifax identifying materially inaccurate and internally inconsistent information concerning the Bank of America tradeline, including but not limited to the date opened, high credit amount, credit limit, date last reported, date last active, and date of last payment.

291.   Pursuant to 15 U.S.C. §1681i(a)(2), the consumer reporting agencies transmitted notice of Plaintiff's disputes and the relevant information provided

44

by Plaintiff to Bank of America, thereby triggering Bank of America's statutory duties under 15 U.S.C. §1681s-2(b.

292.    Upon receiving notice of the disputes from the consumer reporting agencies, Bank of America was required under 15 U.S.C. § 1681s-2(b) to conduct a reasonable investigation, review all relevant information provided by the consumer reporting agencies, report the results of the investigation to the consumer reporting agencies, and, if the information was found to be inaccurate, incomplete, or unverifiable, modify, delete, or cease reporting such information.

293.    After receiving notice of Plaintiff's disputes from the consumer reporting agencies, Bank of America continued furnishing the disputed information and represented to the consumer reporting agencies that the information was accurate without resolving the specific discrepancies identified in Plaintiff's disputes.

294.    On or about September 14, 2025, Plaintiff also mailed a detailed written dispute directly to Bank of America via certified mail specifically identifying inaccuracies in the reporting of the account. The dispute was delivered on September 18, 2025.

295.    Bank of America failed to provide a substantive response to Plaintiff's direct dispute prior to receiving notice from one or more consumer reporting agencies.

296.    On or about November 28, 2025, following notice transmitted by one or more consumer reporting agencies, Bank of America issued a written response stating that it had completed its research and that the information furnished to the consumer reporting agencies was accurate.

297.    Despite verifying the tradeline as accurate, Bank of America did not resolve the specific reporting discrepancies identified by Plaintiff and continued furnishing materially inaccurate and internally inconsistent information

45

**COMPLAINT**

concerning key account-level data fields.

298. Updated consumer reports obtained after expiration of the statutory reinvestigation period confirmed that the disputed data fields remained inaccurate and internally inconsistent within Plaintiff's consumer credit files.

299. On December 1, 2025, Plaintiff received an adverse action notice denying an auto loan. The credit report relied upon in connection with the denial contained the Bank of America tradeline and the disputed inaccuracies described above, resulting in economic harm.

300. On January 27, 2026, Plaintiff was denied a home loan based in part on inaccurate credit information, including the Bank of America tradeline, resulting in loss of housing opportunity and additional economic harm.

301. The conflicting reporting of the account's high credit amount, credit limit, dates opened, and activity dates created an inaccurate and misleading depiction of the account within Plaintiff's consumer credit files.

302. Upon information and belief, Bank of America failed to conduct a reasonable investigation sufficient to review underlying account-level information and resolve the specific discrepancies identified in Plaintiff's disputes.

303. Bank of America's repeated verification of materially inaccurate and internally inconsistent information after receiving notice of dispute from multiple consumer reporting agencies and after Plaintiff's direct written disputes demonstrates reckless disregard for its statutory obligations under 15 U.S.C. § 1681s-2(b).

304. In the alternative, Bank of America's failure to conduct a reasonable investigation and correct inaccurate reporting constitutes negligent noncompliance with the Fair Credit Reporting Act.

305. As a direct and proximate result of Bank of America's violations of 15 U.S.C. § 1681s-2(b), Plaintiff suffered actual damages, including denial of

**COMPLAINT**

credit, denial of an auto loan on December 1, 2025, denial of a home loan on January 27, 2026, loss of housing opportunity, diminished creditworthiness, damage to credit reputation, economic harm, and emotional distress including stress, anxiety, frustration, loss of sleep, and humiliation.

306.   Pursuant to 15 U.S.C. § 1681n(a), Plaintiff is entitled to statutory damages, punitive damages, and reasonable attorneys' fees and costs for Bank of America's willful violations.

307.   Pursuant to 15 U.S.C. § 1681o(a), Plaintiff is entitled to recover actual damages, together with costs and reasonable attorneys' fees, for Bank of America's negligent violations.

## COUNT V
### California Credit Union
### Violation of 15 U.S.C. § 1681s-2(b)

308.   Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

309.   Defendant California Credit Union ("CCU") is a furnisher of information to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2.

310.   Plaintiff maintains a consumer credit account with CCU that CCU furnished and continues to furnish to Experian Information Solutions, Inc., Trans Union LLC, and Equifax Information Services LLC.

311.   Plaintiff submitted written disputes to Experian, Trans Union, and Equifax identifying materially inaccurate and internally inconsistent information concerning the CCU tradeline, including but not limited to the date opened, date last reported, date last active, date of last payment, and related payment history information.

312.   Pursuant to 15 U.S.C. §1681i(a)(2), the consumer reporting agencies transmitted notice of Plaintiff's disputes and the relevant information provided

47

**COMPLAINT**

by Plaintiff to CCU, thereby triggering CCU's statutory duties under 15 U.S.C. §1681s-2(b).

313.    Upon receiving notice of the disputes from the consumer reporting agencies, CCU was required under 15 U.S.C. § 1681s-2(b) to conduct a reasonable investigation, review all relevant information provided by the consumer reporting agencies, report the results of the investigation to the consumer reporting agencies, and, if the information was found to be inaccurate, incomplete, or unverifiable, modify, delete, or cease reporting such information.

314.    On or about September 14, 2025, Plaintiff also mailed a detailed written dispute directly to CCU via certified mail challenging specific inaccuracies in the reporting of the account. The dispute was delivered on September 17, 2025.

315.    On or about September 25, 2025, CCU issued a written response stating that it reports the same credit file to all three consumer reporting agencies and attributing discrepancies to bureau processing or display differences. CCU further represented that it had reviewed the account and determined that it was reporting accurately.

316.    Despite these representations, materially inaccurate and internally inconsistent information concerning key account-level data fields continued to appear in Plaintiff's consumer credit files.

317.    On November 9, 2025, Plaintiff submitted a second written dispute reiterating the unresolved inaccuracies. The dispute was delivered on November 15, 2025.

318.    On or about November 21, 2025, CCU sent a "Credit Reporting Update Confirmation" stating that it had reviewed the account and submitted updated information to the consumer reporting agencies, including updated reporting of the date opened, last reported date, and date last paid.

319.    Notwithstanding CCU's representations that corrections had been

48

COMPLAINT

transmitted, updated consumer reports obtained after expiration of the statutory reinvestigation period continued to reflect materially inaccurate and internally inconsistent information within Plaintiff's consumer credit files.

320.   On November 25, 2025, Plaintiff filed a complaint with the Consumer Financial Protection Bureau placing CCU on further regulatory notice of the continued inaccurate and inconsistent reporting.

321.   On December 1, 2025, Plaintiff received an adverse action notice from Mission Federal Credit Union denying an auto loan. The credit report relied upon in connection with the denial contained the CCU tradeline and the disputed data fields, resulting in economic harm.

322.   On January 27, 2026, Plaintiff was denied a home loan based in part on inaccurate credit information, including the CCU tradeline, resulting in loss of housing opportunity and additional economic harm.

323.   The conflicting reporting of the account's date opened, date last reported, date last active, and date of last payment created an inaccurate and misleading depiction of the account within Plaintiff's consumer credit files.

324.   After receiving notice of Plaintiff's disputes from the consumer reporting agencies, CCU continued furnishing the disputed information and represented to the consumer reporting agencies that the information was accurate without resolving the specific discrepancies identified by Plaintiff.

325.   Upon information and belief, CCU failed to conduct a reasonable investigation sufficient to review underlying account-level information and resolve the specific discrepancies identified in Plaintiff's disputes.

326.   CCU's selective updating of certain reporting fields while materially inaccurate and internally inconsistent information continued to be furnished concerning key account-level data fields demonstrates reckless disregard for its statutory obligations under 15 U.S.C. § 1681s-2(b).

327.   In the alternative, CCU's failure to conduct a reasonable investigation

49

COMPLAINT

and correct inaccurate reporting constitutes negligent noncompliance with the Fair Credit Reporting Act.

328.   As a direct and proximate result of CCU's violations of 15 U.S.C. § 1681s-2(b), Plaintiff suffered actual damages, including denial of credit, denial of an auto loan on December 1, 2025, denial of a home loan on January 27, 2026, loss of housing opportunity, diminished creditworthiness, damage to credit reputation, economic harm, and emotional distress including stress, anxiety, frustration, loss of sleep, and humiliation.

329.   Pursuant to 15 U.S.C. § 1681n(a), Plaintiff is entitled to statutory damages, punitive damages, and reasonable attorneys' fees and costs for CCU's willful violations.

330.   Pursuant to 15 U.S.C. § 1681o(a), Plaintiff is entitled to recover actual damages, together with costs and reasonable attorneys' fees, for CCU's negligent violations.

## COUNT VI
### Citibank, N.A.
### Violation of 15 U.S.C. § 1681s-2(b)

331.   Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

332.   Defendant Citibank, N.A. ("Citibank") is a furnisher of information to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2.

333.   Plaintiff maintains a consumer credit account with Citibank that Citibank furnished and continues to furnish to Experian Information Solutions, Inc., Trans Union LLC, and Equifax Information Services LLC.

334.   Plaintiff submitted written disputes to Experian, Trans Union, and Equifax identifying materially inaccurate and internally inconsistent

50

**COMPLAINT**

information concerning the Citibank tradeline, including but not limited to the date opened, credit limit, high credit amount, reported balance, date last reported, date last active, and date of last payment.

335. Pursuant to 15 U.S.C. §1681i(a)(2), the consumer reporting agencies transmitted notice of Plaintiff's disputes and the relevant information provided by Plaintiff to Citibank, thereby triggering Citibank's statutory duties under 15 U.S.C. §1681s-2(b).

336. Upon receiving notice of the disputes from the consumer reporting agencies, Citibank was required under 15 U.S.C. § 1681s-2(b) to conduct a reasonable investigation, review all relevant information provided by the consumer reporting agencies, report the results of the investigation to the consumer reporting agencies, and, if the information was found to be inaccurate, incomplete, or unverifiable, modify, delete, or cease reporting such information.

337. On or about October 1, 2025, Plaintiff also mailed a detailed written dispute directly to Citibank via certified mail identifying specific inaccuracies in the reporting of the account. The dispute was delivered on October 6, 2025.

338. On November 5, 2025, following notice transmitted by one or more consumer reporting agencies, Citibank issued a written response asserting that it could not locate the account or determine what information was being disputed and would not investigate further without additional information. Citibank further stated that the information would remain on Plaintiff's credit file.

339. Plaintiff's dispute included sufficient identifying information, including government-issued identification, proof of address, and the account number associated with the tradeline. Despite receiving sufficient identifying documentation and the specific account number associated with the disputed tradeline, Citibank refused to conduct a substantive investigation.

340. On November 9, 2025, Plaintiff submitted a second written dispute

**COMPLAINT**

reiterating the unresolved inaccuracies. The dispute was delivered on November 14, 2025.

341. On November 25, 2025, Plaintiff filed a complaint with the Consumer Financial Protection Bureau placing Citibank on further regulatory notice of its failure to investigate.

342. On December 15, 2025, Citibank issued an additional written response reiterating its prior position without correcting the disputed inaccuracies or resolving the specific reporting discrepancies identified by Plaintiff.

343. On December 16, 2025, in response to Plaintiff's CFPB complaint, Citibank represented that it had investigated the account and confirmed that the reporting was accurate and that it would request that the account be marked as "disputed by consumer."

344. Citibank's shifting positions—initially refusing to investigate for alleged lack of sufficient information and subsequently asserting that it had investigated and verified the reporting as accurate—demonstrate that Citibank either failed to conduct any reasonable investigation or conducted an investigation so cursory as to be unreasonable under 15 U.S.C. § 1681s-2(b).

345. Updated consumer reports obtained after Citibank's verification continued to reflect materially inconsistent and conflicting reporting concerning key account-level data fields within Plaintiff's consumer credit files.

346. The conflicting reporting of the account's credit limit, high credit amount, reported balance, and activity dates created an inaccurate and misleading depiction of the account within Plaintiff's consumer credit files.

347. On December 1, 2025, Plaintiff was denied an auto loan based in part on inaccurate credit information, including the Citibank tradeline.

348. On January 27, 2026, Plaintiff was denied a home loan based in part on inaccurate credit information, including the Citibank tradeline, resulting in loss of housing opportunity and economic harm.

COMPLAINT

349. After receiving notice of Plaintiff's disputes from the consumer reporting agencies, Citibank continued furnishing the disputed information and represented to the consumer reporting agencies that the information was accurate without resolving the specific discrepancies identified by Plaintiff.

350. Upon information and belief, Citibank failed to conduct a reasonable investigation sufficient to review underlying account-level information and resolve the specific discrepancies identified in Plaintiff's disputes.

351. Citibank's conduct demonstrates reckless disregard for its statutory obligations under 15 U.S.C. § 1681s-2(b).

352. In the alternative, Citibank's failure to conduct a reasonable investigation and correct inaccurate reporting constitutes negligent noncompliance with the Fair Credit Reporting Act.

353. As a direct and proximate result of Citibank's violations of 15 U.S.C. § 1681s-2(b), Plaintiff suffered actual damages, including denial of credit, denial of an auto loan on December 1, 2025, denial of a home loan on January 27, 2026, loss of housing opportunity, diminished creditworthiness, damage to credit reputation, economic harm, and emotional distress including stress, anxiety, frustration, loss of sleep, and humiliation.

354. Pursuant to 15 U.S.C. § 1681n(a), Plaintiff is entitled to statutory damages, punitive damages, and reasonable attorneys' fees and costs for Citibank's willful violations.

355. Pursuant to 15 U.S.C. § 1681o(a), Plaintiff is entitled to recover actual damages, together with costs and reasonable attorneys' fees, for Citibank's negligent violations.

## COUNT VII
### Wells Fargo Bank, N.A.
### Violation of 15 U.S.C. § 1681s-2(b)

53

COMPLAINT

356. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

357. Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a furnisher of information to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2.

358. Plaintiff maintains a consumer credit account with Wells Fargo that Wells Fargo furnished and continues to furnish to Experian Information Solutions, Inc., Trans Union LLC, and Equifax Information Services LLC.

359. Plaintiff submitted written disputes to Experian, Trans Union, and Equifax identifying materially inaccurate and internally inconsistent information concerning the Wells Fargo tradeline, including but not limited to the date opened, high credit amount, credit limit, date last reported, date last active, and date of last payment.

360. Pursuant to 15 U.S.C. §1681i(a)(2), the consumer reporting agencies transmitted notice of Plaintiff's disputes and the relevant information provided by Plaintiff to Wells Fargo, thereby triggering Wells Fargo's statutory duties under 15 U.S.C. §1681s-2(b).

361. Upon receiving notice of the disputes from the consumer reporting agencies, Wells Fargo was required under 15 U.S.C. § 1681s-2(b) to conduct a reasonable investigation, review all relevant information provided by the consumer reporting agencies, report the results of the investigation to the consumer reporting agencies, and, if the information was found to be inaccurate, incomplete, or unverifiable, modify, delete, or cease reporting such information.

362. On or about September 14, 2025, Plaintiff also mailed a detailed written dispute directly to Wells Fargo via certified mail challenging specific inaccuracies in the reporting of the account. The dispute was delivered and

54

**COMPLAINT**

signed for on September 19, 2025.

363.  On September 29, 2025, Wells Fargo issued a written response stating that it had "carefully researched" the account and determined that the information furnished to the consumer reporting agencies was accurate. The response did not address the specific discrepancies identified by Plaintiff and did not explain the investigative steps undertaken to verify the disputed reporting fields.

364.  On November 9, 2025, Plaintiff submitted a second written dispute reiterating the unresolved inaccuracies. The dispute was delivered on November 17, 2025.

365.  On November 25, 2025, Plaintiff filed a complaint with the Consumer Financial Protection Bureau placing Wells Fargo on additional regulatory notice of its failure to correct the disputed reporting.

366.  On December 1, 2025, and again on December 5, 2025, Wells Fargo reaffirmed in writing that it had reviewed the account and confirmed that the reporting—including the date opened, high credit amount, balance, and payment history—was accurate. These correspondences constituted repeated verifications of the disputed information after notice had been transmitted pursuant to 15 U.S.C. § 1681i(a)(2).

367.  Updated consumer reports obtained after Wells Fargo's verifications continued to reflect materially inconsistent and conflicting reporting concerning key account-level data fields within Plaintiff's consumer credit files, including the reporting of a $0.00 credit limit to Equifax while reporting a materially different credit limit elsewhere.

368.  The conflicting reporting of the account's credit limit, high credit amount, date opened, date last reported, date last active, and date of last payment created an inaccurate and misleading depiction of the account within Plaintiff's consumer credit files.

55

COMPLAINT

369. On December 1, 2025, Plaintiff was denied an auto loan based in part on inaccurate credit information, including the Wells Fargo tradeline.

370. On January 27, 2026, Plaintiff was denied a home loan based in part on inaccurate credit information, including the Wells Fargo tradeline, resulting in loss of housing opportunity and economic harm.

371. After receiving notice of Plaintiff's disputes from the consumer reporting agencies, Wells Fargo repeatedly verified the disputed tradeline as accurate without resolving the specific data-field discrepancies identified by Plaintiff and continued furnishing materially inaccurate and internally inconsistent information in violation of 15 U.S.C. § 1681s-2(b).

372. Upon information and belief, Wells Fargo failed to conduct a reasonable investigation sufficient to review underlying account-level information and resolve the specific discrepancies identified in Plaintiff's disputes.

373. Wells Fargo's repeated confirmations of accuracy despite the continued presence of materially inconsistent and conflicting account-level data fields demonstrate reckless disregard for its statutory obligations under 15 U.S.C. § 1681s-2(b).

374. In the alternative, Wells Fargo's failure to conduct a reasonable investigation and correct inaccurate reporting constitutes negligent noncompliance with the Fair Credit Reporting Act.

375. As a direct and proximate result of Wells Fargo's violations of 15 U.S.C. § 1681s-2(b), Plaintiff suffered actual damages, including denial of credit, denial of an auto loan on December 1, 2025, denial of a home loan on January 27, 2026, loss of housing opportunity, diminished creditworthiness, damage to credit reputation, economic harm, and emotional distress including stress, anxiety, frustration, loss of sleep, and humiliation.

376. Pursuant to 15 U.S.C. § 1681n(a), Plaintiff is entitled to statutory damages, punitive damages, and reasonable attorneys' fees and costs for Wells

56

**COMPLAINT**

Fargo's willful violations.

377. Pursuant to 15 U.S.C. § 1681o(a), Plaintiff is entitled to recover actual damages, together with costs and reasonable attorneys' fees, for Wells Fargo's negligent violations.

## COUNT VIII
### Trans Union LLC
### Violations of 15 U.S.C. §§ 1681e(b) and 1681i(a)

378. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

379. Defendant Trans Union LLC ("TransUnion") is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

380. Pursuant to 15 U.S.C. § 1681e(b), TransUnion was required to follow reasonable procedures to assure maximum possible accuracy of the information it prepared and published concerning Plaintiff.

381. TransUnion prepared and published consumer reports concerning Plaintiff that contained materially inaccurate, incomplete, and internally inconsistent information, including but not limited to conflicting balances for the same tradelines, inconsistent high credit and credit limit reporting, incorrect dates opened, incorrect dates last reported, incorrect dates last active, incorrect dates of last payment, inaccurate personal identifiers, and materially inconsistent data fields concerning the same accounts.

382. These inaccuracies were not minor or technical discrepancies. The conflicting and internally inconsistent data fields created a materially misleading depiction of Plaintiff's credit history, account balances, and payment activity within TransUnion's consumer reports. Such discrepancies increase the likelihood that lenders will interpret the information negatively

**COMPLAINT**

when evaluating a consumer's creditworthiness.

383. The presence of materially inaccurate and internally inconsistent reporting within TransUnion's published consumer reports demonstrates that TransUnion failed to maintain and follow reasonable procedures to assure maximum possible accuracy prior to preparing and publishing Plaintiff's credit information, in violation of 15 U.S.C. § 1681e(b).

384. Pursuant to 15 U.S.C. § 1681i(a), when a consumer disputes the completeness or accuracy of information contained in his credit file and directly notifies a consumer reporting agency, the agency must conduct a reasonable reinvestigation, review all relevant information provided by the consumer, and record the current status of the disputed information within thirty (30) days.

385. On September 14, 2025, Plaintiff submitted a detailed written dispute to TransUnion identifying specific inaccuracies in multiple tradelines and personal identifying information. The dispute was delivered on September 18, 2025, thereby triggering TransUnion's statutory reinvestigation duties under 15 U.S.C. § 1681i(a).

386. TransUnion failed to conduct a reasonable reinvestigation of the disputed information and failed to resolve the specific inaccuracies identified in Plaintiff's disputes.

387. On November 9, 2025, Plaintiff submitted a second written dispute renewing his request for a lawful reinvestigation. That dispute was delivered on November 13, 2025.

388. Following receipt of Plaintiff's disputes, TransUnion issued automated status communications stating that the dispute was being processed or that it was awaiting responses from creditors. These communications did not provide substantive reinvestigation results, did not identify the furnishers contacted, and did not explain the method of verification used.

389. On December 6, 2025, TransUnion issued "Investigation Results" stating

58

**COMPLAINT**

that multiple disputed tradelines were "verified as accurate" or "updated," despite the continued presence of materially inconsistent and conflicting data fields.

390.   On January 13, 2026, TransUnion issued an additional response again confirming that the disputed tradelines were verified without providing a meaningful description of the procedures used to determine accuracy.

391.   Upon information and belief, TransUnion's reinvestigation relied primarily on automated dispute processing procedures and furnisher confirmations rather than conducting an independent or substantive review of the disputed data fields within Plaintiff's credit file.

392.   TransUnion failed to conduct a reasonable reinvestigation as required by 15 U.S.C. §1681i(a) because it failed to resolve conflicting balances, credit limits, high credit amounts, activity dates, and payment information within Plaintiff's credit file and continued reporting the disputed information as accurate despite the presence of material discrepancies.

393.   TransUnion further failed to comply with 15 U.S.C. §1681i(a)(6) by failing to provide Plaintiff with a meaningful description of the procedure used to determine the accuracy and completeness of the disputed information and the method of verification relied upon.

394.   On December 1, 2025, Plaintiff was denied an auto loan based in part on inaccurate credit information appearing in his TransUnion credit file.

395.   On January 27, 2026, Plaintiff was denied a home loan based in part on inaccurate credit information appearing in his TransUnion credit file, resulting in loss of housing opportunity and economic harm.

396.   As a direct and proximate result of TransUnion's violations of 15 U.S.C. §§ 1681e(b) and 1681i(a), Plaintiff suffered actual damages, including denial of credit, loss of housing opportunity, diminished creditworthiness, damage to credit reputation, economic harm, and emotional distress including stress,

**COMPLAINT**

anxiety, frustration, loss of sleep, and humiliation.

397.    TransUnion's violations were willful in that, after receiving detailed written disputes identifying specific inaccuracies and inconsistencies, it repeatedly marked disputed tradelines as "verified as accurate," issued boilerplate responses, relied primarily on automated dispute processing systems, and failed to reasonably evaluate and resolve the disputed reporting fields before continuing to publish the information. This conduct demonstrates reckless disregard for its statutory duties.

398.    In the alternative, TransUnion's conduct was negligent.

399.    Pursuant to 15 U.S.C. § 1681n(a), Plaintiff is entitled to statutory damages, punitive damages, and reasonable attorneys' fees and costs for TransUnion's willful violations.

400.    Pursuant to 15 U.S.C. § 1681o(a), Plaintiff is entitled to recover actual damages, together with costs and reasonable attorneys' fees, for TransUnion's negligent violations.

## COUNT IX

### Experian Information Solutions Inc.

### Violations of 15 U.S.C. §§ 1681e(b) and 1681i(a)

401.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

402.    Defendant Experian Information Solutions Inc. ("Experian") is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

403.    Pursuant to 15 U.S.C. § 1681e(b), Experian was required to follow reasonable procedures to assure maximum possible accuracy of the information it prepared and published concerning Plaintiff.

404.    Experian prepared and published consumer reports concerning Plaintiff

**COMPLAINT**

that contained materially inaccurate, incomplete, and internally inconsistent information, including but not limited to conflicting balances and high credit amounts, inconsistent credit limits, inconsistent dates opened, inconsistent dates last reported and last active, inconsistent dates of last payment, inconsistent historical account data, and inaccurate personal identifying information.

405.   These inaccuracies were not minor or technical discrepancies. The conflicting and internally inconsistent data fields created a materially misleading depiction of Plaintiff's credit history, account balances, and payment activity within Experian's consumer reports.

406.   The presence of materially inaccurate and internally inconsistent reporting within Experian's published consumer reports demonstrates that Experian failed to maintain and follow reasonable procedures to assure maximum possible accuracy prior to preparing and publishing Plaintiff's credit information, in violation of 15 U.S.C. § 1681e(b).

407.   Pursuant to 15 U.S.C. § 1681i(a), when a consumer disputes the completeness or accuracy of information contained in his credit file and directly notifies a consumer reporting agency, the agency must conduct a reasonable reinvestigation, review all relevant information provided by the consumer, and record the current status of the disputed information within thirty (30) days.

408.   On September 14, 2025, Plaintiff submitted a detailed written dispute to Experian identifying specific inaccuracies in multiple tradelines and personal identifying information. The dispute was delivered and signed for on September 18, 2025, thereby triggering Experian's statutory reinvestigation duties under 15 U.S.C. § 1681i(a).

409.   On September 23, 2025, Experian issued a written response stating that it had "not taken any action" on Plaintiff's dispute because the request allegedly did not appear to have been sent or authorized by Plaintiff.

410.   Plaintiff's dispute was sent via certified mail and included a copy of his

61

**COMPLAINT**

government-issued identification, proof of address, and sufficient identifying information to enable Experian to locate his credit file. Despite possessing documentation reasonably sufficient to verify Plaintiff's identity and process the dispute, Experian refused to conduct any reinvestigation and continued publishing the disputed information.

411. On November 9, 2025, Plaintiff submitted a second written dispute renewing his request for a lawful reinvestigation. The dispute was delivered and signed for on November 15, 2025.

412. In response, Experian issued correspondence dated November 19 and December 17, 2025, stating that certain items were "verified," "updated," or "previously verified." These communications failed to provide a meaningful explanation of the reinvestigation, failed to identify the furnishers or sources consulted, failed to describe the method of verification used, and failed to explain how the specific inaccuracies identified by Plaintiff were evaluated.

413. On December 17, 2025, Experian issued "Dispute Results" reflecting that multiple disputed tradelines were marked as "Updated," "Processed," or "Remains," with certain tradelines reflecting that the reporting company had certified the information as accurate. Despite these designations, materially inconsistent and conflicting data fields within Plaintiff's Experian credit file remained unresolved.

414. Upon information and belief, Experian's reinvestigation relied primarily on automated dispute processing procedures and furnisher confirmations rather than conducting an independent or substantive review of the disputed data fields or reasonably evaluating the accuracy and completeness of the information before continuing to report it.

415. Experian failed to conduct a reasonable reinvestigation as required under 15 U.S.C. §1681i(a) because it confirmed disputed information as accurate despite unresolved inconsistencies in reported balances, high credit amounts,

**COMPLAINT**

credit limits, dates opened, dates last reported, and dates of last payment, and because it failed to independently evaluate the disputed reporting fields before continuing to report the information.

416.    Experian further failed to comply with 15 U.S.C. § 1681i(a)(6) by failing to provide Plaintiff with a meaningful written description of the procedures used to determine the accuracy and completeness of the disputed information.

417.    On December 1, 2025, Plaintiff was denied an auto loan based in part on inaccurate credit information appearing in his Experian credit file.

418.    On January 27, 2026, Plaintiff was denied a home loan based in part on inaccurate credit information appearing in his Experian credit file, resulting in loss of housing opportunity and economic harm.

419.    As a direct and proximate result of Experian's violations of 15 U.S.C. §§ 1681e(b) and 1681i(a), Plaintiff suffered actual damages, including denial of credit, loss of housing opportunity, diminished creditworthiness, damage to credit reputation, economic harm, and emotional distress including stress, anxiety, frustration, loss of sleep, and humiliation.

420.    Experian's violations were willful in that, after receiving detailed written disputes supported by government-issued identification and proof of address, and after being placed on notice through a formal Consumer Financial Protection Bureau complaint, it refused to process Plaintiff's dispute, issued boilerplate responses, marked disputed tradelines as "Updated," "Processed," or "Remains" despite documented inconsistencies, and continued publishing materially inaccurate and inconsistent information. This conduct demonstrates reckless disregard for its statutory obligations.

421.    In the alternative, Experian's conduct was negligent.

422.    Pursuant to 15 U.S.C. § 1681n(a), Plaintiff is entitled to statutory damages, punitive damages, and reasonable attorneys' fees and costs for Experian's willful violations.

63

**COMPLAINT**

423.   Pursuant to 15 U.S.C. § 1681o(a), Plaintiff is entitled to recover actual damages, together with costs and reasonable attorneys' fees, for Experian's negligent violations.

## COUNT X

### Equifax Information Services LLC
### Violations of 15 U.S.C. §§ 1681e(b) and 1681i(a)

424.   Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

425.   Defendant Equifax Information Services LLC ("Equifax") is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

426.   Pursuant to 15 U.S.C. § 1681e(b), Equifax was required to follow reasonable procedures to assure maximum possible accuracy of the information it prepared and published concerning Plaintiff.

427.   Equifax prepared and published consumer reports concerning Plaintiff that contained materially inaccurate, incomplete, and internally inconsistent information, including but not limited to conflicting balances and high credit amounts, inconsistent credit limits, inconsistent dates opened, inconsistent dates last reported and last active, inconsistent dates of last payment, inconsistent historical account data, and inaccurate or outdated personal identifying information.

428.   These inaccuracies were not minor or technical discrepancies. The conflicting and internally inconsistent data fields created a materially misleading depiction of Plaintiff's credit history, account balances, and payment activity within Equifax's consumer reports.

429.   The continued preparation and publication of consumer reports containing materially inaccurate and internally inconsistent information

64

**COMPLAINT**

demonstrates that Equifax failed to maintain and follow reasonable procedures to assure maximum possible accuracy, in violation of 15 U.S.C. § 1681e(b).

430.   Pursuant to 15 U.S.C. § 1681i(a), when a consumer disputes the completeness or accuracy of information contained in his credit file and directly notifies a consumer reporting agency, the agency must conduct a reasonable reinvestigation, review all relevant information provided by the consumer, and record the current status of the disputed information within thirty (30) days.

431.   On October 1, 2025, Plaintiff submitted a detailed written dispute to Equifax identifying specific inaccuracies in multiple tradelines and personal identifying information. The dispute was delivered and signed for on October 5, 2025, thereby triggering Equifax's statutory reinvestigation duties under 15 U.S.C. § 1681i(a).

432.   On October 7, 2025, Equifax issued written "Dispute Results" stating that certain personal identifiers had been deleted and that other disputed information had been reviewed or verified. The correspondence relied on generalized statements that reporting companies had certified the information as accurate and did not provide a meaningful description of any independent procedures undertaken by Equifax to determine accuracy.

433.   On October 8, 2025, Equifax issued a revised credit report reflecting that multiple tradelines had been marked "Updated" or "Verified as Reported." Despite these designations, the revised report continued to contain materially inconsistent and conflicting account-level data fields within Plaintiff's Equifax credit file, including discrepancies in balances, high credit amounts, dates opened, dates last reported, and payment history information.

434.   On November 9, 2025, Plaintiff submitted a second written dispute renewing his request for a lawful reinvestigation. The dispute was delivered and signed for on November 16, 2025.

435.   In response, Equifax issued additional correspondence stating that certain

**COMPLAINT**

disputed items had been "updated" or "verified as accurate" based on reporting company responses, and at times characterized the renewed dispute as previously processed or frivolous. Equifax did not meaningfully address the documented inconsistencies raised by Plaintiff and did not provide a legally sufficient explanation identifying any information required to complete the investigation as required under 15 U.S.C. §1681i(a)(3), despite Plaintiff having already provided sufficient identifying information and documentation to enable a reinvestigation.

436.    Upon information and belief, Equifax's reinvestigation relied primarily on automated dispute processing procedures and furnisher confirmations rather than conducting an independent or substantive review of the disputed data fields or reasonably evaluating the accuracy and completeness of the information before continuing to report it.

437.    Equifax failed to conduct a reasonable reinvestigation as required under 15 U.S.C. § 1681i(a) because it confirmed disputed information as accurate despite unresolved discrepancies in reported balances, high credit amounts, credit limits, dates opened, dates last reported, and payment history, and continued reporting the disputed information without correcting those inconsistencies or reasonably evaluating the disputed reporting fields.

438.    Equifax further failed to comply with 15 U.S.C. § 1681i(a)(6) by failing to provide Plaintiff with a meaningful written description of the procedures used to determine the accuracy and completeness of the disputed information.

439.    On January 27, 2026, Plaintiff was denied a home loan after the lender obtained and relied upon Plaintiff's Equifax credit report and credit score. The Equifax report contained materially inaccurate and inconsistent tradeline information.

440.    As a direct and proximate result of Equifax's violations of 15 U.S.C. §§ 1681e(b) and 1681i(a), Plaintiff suffered actual damages, including denial of

66

**COMPLAINT**

credit, denial of a home loan on January 27, 2026, loss of housing opportunity, diminished creditworthiness, damage to credit reputation, economic harm, and emotional distress including stress, anxiety, frustration, loss of sleep, and humiliation.

441.  Equifax's violations were willful in that, after receiving detailed written disputes and after being placed on notice through Plaintiff's Consumer Financial Protection Bureau complaint, it repeatedly verified and republished disputed information without reasonably investigating or resolving the documented material discrepancies and relied primarily on automated dispute processing systems and furnisher certifications without conducting a substantive or independent review. This conduct demonstrates reckless disregard for its statutory obligations.

442.  In the alternative, Equifax's conduct was negligent.

443.  Pursuant to 15 U.S.C. § 1681n(a), Plaintiff is entitled to statutory damages, punitive damages, and reasonable attorneys' fees and costs for Equifax's willful violations.

444.  Pursuant to 15 U.S.C. § 1681o(a), Plaintiff is entitled to recover actual damages, together with costs and reasonable attorneys' fees, for Equifax's negligent violations.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff Rudy J. Nanquil respectfully requests that this Court enter judgment in his favor and against each Defendant individually, and jointly and severally where permitted by law, and award the following relief:

1.  An award of actual damages pursuant to 15 U.S.C. §§ 1681n and 1681o, in an amount to be determined at trial, including but not limited to:

67

COMPLAINT

- Emotional distress, mental anguish, stress, anxiety, frustration, and loss of sleep;
- Damage to reputation and loss of creditworthiness;
- Denial of credit, loss of housing opportunity, and other lost credit opportunities;
- Out-of-pocket expenses and economic harm; and
- All other pecuniary and non-pecuniary losses proximately caused by Defendants' violations.

2. Statutory damages pursuant to 15 U.S.C. § 1681n(a), including up to $1,000 per Defendant for willful noncompliance.

3. Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2) in an amount sufficient to punish Defendants and deter future willful and reckless noncompliance with the Fair Credit Reporting Act.

4. An award of costs of suit and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n(a)(3) and 1681o(a)(2).

5. Declaratory relief as permitted by law and such additional equitable relief as the Court deems appropriate and authorized under the Fair Credit Reporting Act.

6. Pre-judgment and post-judgment interest at the maximum legal rate permitted by law.

7. An order requiring Defendants to correct or delete inaccurate information from Plaintiff's consumer credit files to the extent permitted by law.

8. Such other and further relief as the Court deems just, equitable, and proper.

Dated: March 4, 2026                                    Respectfully submitted,


                                                        */s/ Rudy J. Nanquil*

                                                        Rudy J. Nanquil, Plaintiff, Pro Se

68

**COMPLAINT**

1150 E Street, Unit 1801

San Diego, CA 92101

rudynanquil@gmail.com

(619) 414-6686


## VERIFICATION

I, Rudy J. Nanquil, declare as follows:

I am the Plaintiff in this action. I have read the foregoing Verified Complaint for Damages and Demand for Jury Trial and know the contents thereof. The factual allegations contained therein are true and correct to the best of my personal knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 4th day of March 2026.              /s/ _Rudy J. Nanquil_

**COMPLAINT**